2023 IL App (1st) 200903

SIXTH DIVISION
April 28, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-20-0903

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 13513 |
| | ) | |
| ANGEL CLASS, | ) | Honorable |
| | ) | Angela Munari Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices C.A. Walker and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial, Angel Class was convicted of first degree murder with a firearm and aggravated discharge of a firearm and sentenced to 45 years in prison. The convictions stemmed from a drive-by shooting on October 22, 2001, that killed Tony Koniewicz. The State's case relied almost entirely on the testimony of a single eyewitness, who testified that she was driving the car from which Mr. Class fired upon Mr. Koniewicz. No other witnesses identified Mr. Class as Mr. Koniewicz's killer or could even provide circumstantial evidence suggesting his involvement in the crime. Nor was there any physical evidence connecting him to the shooting. Mr. Class has always maintained his innocence, claiming he was at home with his family on the night of the shooting and that he had nothing to do with it.

¶ 2    This appeal concerns the dismissal of Mr. Class's successive petition for postconviction relief where, among other things, he advanced a claim of actual innocence. For the reasons that follow, we find that his petition was erroneously dismissed at the second stage. Taken cumulatively, Mr. Class's petition made a substantial showing of actual innocence, entitling him to a third-stage evidentiary hearing where the circuit court, serving as factfinder, must determine whether the evidence introduced demonstrates that Mr. Class is entitled to a new trial.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Trial

¶ 5    The only witness that identified Mr. Class at trial as the person who murdered Tony Koniewicz was Heather Ambrose. She testified that she was an associate of some Satan Disciples gang members and that on the day of the shooting, Mr. Class and a man named Elias (or Eli) Salazar—both members of the gang—arrived at her grandparents' house around 7 p.m. and had her drive them in her car (a gray 1991 Pontiac Grand Am) to territory controlled by the C-Notes, a rival gang. She knew Mr. Class from grammar school, and she knew Mr. Salazar because she used to date his brother.

¶ 6    According to Ms. Ambrose, Mr. Salazar sat in the back seat of her car and Mr. Class sat in the front. She testified that once they entered rival gang territory, Mr. Class instructed her to pull up next to a car parked near the intersection of Oakley Boulevard and Ohio Street. She testified that when they reached the parked car, Mr. Class hailed its occupants as if to greet them before pulling out a gun and firing numerous shots into the car while shouting gang slogans. The other car then attempted to make a U-turn, and Mr. Class told her to look straight ahead and drive to his house. When she dropped Mr. Class and Mr. Salazar off at Mr. Class's house, Mr. Class told her to go straight home, and she did.

¶ 7 She testified that the following morning, Mr. Class returned to her house with Mr. Salazar and told her they had to clean the car. The three of them then went to pick up a woman named Pattie, a friend of Mr. Class's, and they all went to the car wash. Ms. Ambrose further testified that Mr. Class told her not to talk to the police. She claimed that three days later, Mr. Class gave her gas money to return to her home state of Kentucky and threatened to harm her grandparents if she told anyone anything about the shooting. She left for Kentucky the following day.

¶ 8 On cross-examination, Ms. Ambrose acknowledged that she had a Satan Disciples tattoo and that she had been convicted in federal court of aiding and abetting aggravated criminal sexual abuse. She also admitted that when detectives tracked her down in Kentucky and asked her about the shooting, she initially told them that she did not know anything. She then told them that someone had borrowed her car on the date of the shooting. She also stated during her cross-examination that she could not remember whether anyone besides Mr. Salazar and Mr. Class were in her car on the night of the shooting, and she said that, independent of the events surrounding the shooting, she had been planning to go to Kentucky to visit her pregnant sister.

¶ 9 Several other witnesses testified for the State, although they did not identify anyone as the murderer. These witnesses confirmed that Mr. Koniewicz was shot, but some of their testimony suggested this occurred later in the evening than Ms. Ambrose's testimony would indicate. Tammy Scatanese, Mr. Koniewicz's sister, testified that "just after 9:00" on the evening of the shooting "the phone rang" and the person on the other line "said that [Mr. Koniewicz] was in a car and had been shot." The State also called Gerard Recasi, who testified that he was a friend of Mr. Koniewicz, a fellow member of the C-Notes gang, and the person in the passenger seat of Mr. Koniewicz's four-door red Corsica during the shooting that killed Mr. Koniewicz.

¶ 10 Describing his experience during the shooting, Mr. Recasi testified that he instinctively

ducked during the gunfire. He recalled hearing between 9 and 10 gunshots. When it was over and he got back up, apparently unscathed, he looked over at Mr. Koniewicz and noticed that Mr. Koniewicz was bleeding from the mouth and chest. He testified that Mr. Koniewicz, who was in the driver's seat, then attempted to turn the corner but was struggling from his injuries and "after I seen he couldn't take it no more," Mr. Recasi took control of the wheel and drove to the hospital.

¶ 11    Mr. Recasi testified that he was unable to see who fired the shots or describe the car from which they came. The only time frame that Mr. Recasi gave for the shooting was "evening hours." The State then presented Mr. Recasi with testimony he had given before the grand jury, where he had stated that the car that fired at them was gray and had pulled up to the left side of their car, next to Mr. Koniewicz. On redirect, Mr. Recasi reiterated that while he was in the car during the shooting, he did not actually see Mr. Koniewicz get shot.

¶ 12    The State also called several law enforcement witnesses. Officer Luis Arroyo of the Chicago Police Department (CPD) testified that at about 10 p.m. on the day of the shooting, he was told to go to St. Mary's Hospital at 2233 West Division Street, where a shooting victim had been taken. When he arrived, he spoke with Mr. Recasi and wrote an initial report. Mr. Recasi gave a description of the color of the car that had shot at them, but no description of the shooter. Officer Arroyo then visited the crime scene and Mr. Koniewicz's car and recorded his observations.

¶ 13    The State next called Robert J. Davie, a forensic investigator with CPD, who described visiting the crime scene, taking photographs, and collecting firearm evidence. Mr. Davie testified that he and his partner collected nine fired cartridges and two bullets, all from a 9-millimeter weapon. He testified that a third bullet was later recovered from a bullet hole in the driver's side door of Mr. Koniewicz's vehicle. The parties then entered a stipulation that if called to testify, a

4

witness from the Illinois State Police Forensic Science Laboratory would have testified that the two bullets collected from the scene were fired from the same 9-millimeter gun, as was the third bullet recovered from the door of the car. They also stipulated that none of the bullets contained impressions suitable for fingerprint analysis and that a fourth bullet recovered during Mr. Koniewicz's autopsy came from the same firearm as the other three bullets.

¶ 14 Detective Robert Rodriguez of the CPD testified that he was assigned to investigate the shooting at around 10:40 p.m. on the night of October 22, 2001. He and his partner first went to the scene, where he canvassed the area and noticed shell casings and broken glass. They then went to the hospital, where they spoke with Mr. Recasi and some of Mr. Koniewicz's family members. Detective Rodriguez testified that, initially, he had no leads or descriptions of the shooter, but that as he continued to investigate, he eventually received an anonymous tip that Heather Ambrose had been "talking about her participation in the drive-by shooting." He also learned that she had left Chicago and was living with her mother in Richmond, Kentucky. When he travelled to Kentucky to speak with Ms. Ambrose, she initially denied any firsthand knowledge of the shooting. After speaking with Ms. Ambrose, the detective then began to look for Eli Salazar.

¶ 15 Detective Rodriguez was unable to locate Mr. Salazar in Chicago, but he received information that Mr. Salazar may have fled to Texas. Eventually, Detective Rodriguez located him in Gainesville, Texas. Detective Rodriguez interviewed Mr. Salazar, who was uncooperative at first, but eventually gave a handwritten statement (which was not introduced at trial). He also agreed to come back to Chicago to testify before the grand jury. Detective Rodriguez also testified that another detective had interviewed someone named "Pattie." Detective Rodriguez then described trying to locate Mr. Class for several months and getting an arrest warrant. He was not present at Mr. Class's arrest, but he stated that it took place at Mr. Class's mother's house in

Chicago.

¶ 16    Officer Delatorrie of the CPD's Gang Tactical Team testified that he had been assigned the task of tracking down Mr. Class and arresting him. On April 27, 2002, he had received information that there was going to be a party for Mr. Class's daughter at a house and that Mr. Class might be there. Officer Delatorrie and five fellow officers went to the house to set up surveillance and saw Mr. Class standing there. Mr. Class made eye contact with the officers then ran into the house. Two of the officers chased Mr. Class into the house. Officer Delatorrie testified that Mr. Class was detained while trying to escape through the rear of the house. The State rested its case after entering a few more stipulations and calling one more law enforcement witness, an investigator for the Cook County State's Attorney's Office, who described how law enforcement had managed to track down Eli Salazar.

¶ 17    After unsuccessfully moving for a directed finding for a judgment of acquittal, Mr. Class called Milton Correa as his first witness. Defense counsel attempted to have Mr. Correa testify to a statement that he said Eli Salazar made to him, in which Mr. Salazar admitted to shooting Mr. Koniewicz. The State objected, arguing that counsel was eliciting hearsay. Counsel responded that the statement was nonetheless admissible as a statement against Mr. Salazar's penal interest. The State's objection was sustained. Defense counsel, seemingly unprepared for this ruling, asked the court to hold the case until the following day.

¶ 18    The following day, defense counsel asked for another continuance until the following week so he could put on the rest of the case "based upon what investigators have located." When that date came, Mr. Class was present, but his attorney was not, and the court continued the matter until the following day. Mr. Class's attorney missed that court date as well, claiming he had the flu and needed a few days to recover. When the next trial date came, on January 26, 2004, defense counsel

6

was present but asked for another continuance, claiming that a critical witness "decided to disappear on us." The State objected to any further delay, but the court granted one final continuance. On February 4, 2004, the date set for trial, defense counsel reported that this "critical witness" was a man named Christopher Stanley and that, despite diligent efforts, counsel had not been able to locate him. Defense counsel then called Mr. Class to the stand to testify.

¶ 19    In his trial testimony, Mr. Class admitted to being a member of the Satan Disciples. He said that he lived with his mother, his girlfriend, and his two children. He knew Heather Ambrose from school and said that she was also a member of the Satan Disciples and that she had a tattoo of a devil with two smoking guns, which is the sign for the gang. He testified that he also knew Eli Salazar as a member of the Satan Disciples. Mr. Class explained that both he and Mr. Salazar held rank within the gang. Mr. Salazar "controlled Texas," but, when in Chicago, Mr. Class held authority over Mr. Salazar.

¶ 20    According to Mr. Class, his gang's tensions with the C-Notes were the result of provocations by Mr. Salazar, who would drive through C-Notes territory and pull out his cellphone, "acting like he had a gun." Mr. Class stated that he had confronted Mr. Salazar the Saturday before the murder of Mr. Koniewicz about these provocations and told him to stop "messing with" the C-Notes. He explained that he was upset about Mr. Salazar's provocations because they had led to his friend Roberto Karsnetto being shot by the C-Notes.

¶ 21    Mr. Class testified that while Mr. Salazar went back and forth between Chicago and Texas, he had been living in Chicago with a woman named Onyx Santana for about a month before Mr. Koniewicz was shot. He further testified that, although there had been problems with the Satan Disciples and the C-Notes five years earlier, tensions had died down until Mr. Salazar came back from one of his trips from Texas, with Heather Ambrose. Mr. Class blamed Mr. Salazar and Ms.

Ambrose, who he described as boyfriend and girlfriend, for "starting confusion" with the C-Notes. According to Mr. Class, Ms. Ambrose had also previously been romantically involved with Mr. Salazar's brother, as well as with some C-Notes. When Mr. Class confronted Mr. Salazar that Saturday before the shooting about his behavior towards the C-Notes, he also told him that ever since he started to hang out with Ms. Ambrose, "a lot of my friends were getting hurt." Mr. Class claimed that he demanded that Mr. Salazar not bring Ms. Ambrose around anymore, and "Eli got a little upset, because I was, you know, making direct comments towards his girlfriend."

¶ 22    Mr. Class testified that, the following day, he had another confrontation with Mr. Salazar and Ms. Ambrose. When the couple showed up at a gang meeting, Mr. Class ordered Mr. Salazar not to "bring this girl around here." He testified that Ms. Ambrose then got upset and "said something wrong to me," so Mr. Class "muffed her in the face." Mr. Salazar and Ms. Ambrose then got into their car and angrily took off. Mr. Salazar then returned to the meeting a few minutes later, without Ms. Ambrose. This encounter took place the night before the murder of Tony Koniewicz.

¶ 23    Mr. Class testified that he had nothing to do with the murder of Tony Koniewicz and that he was home with his family at the time of the shooting. He also testified that after the murder of Mr. Koniewicz, when his mother told him the police had been by the house looking for him, he did not think much of it, as "they would always come question me on previous cases." He did not treat the matter with urgency, as he assumed they wanted to talk about a different incident from a few months before, in which he had been the one shot. He also testified that he did not see Ms. Ambrose or Mr. Salazar again after telling them off the day before the shooting. He denied ever going with them to a car wash. He also denied running away from the police when they eventually came to arrest him at his mother's house.

¶ 24    Defense counsel called no additional witnesses, and Mr. Class was found guilty of first degree murder. On September 1, 2004, the court sentenced him to 45 years, 20 years for the underlying offense, plus a mandatory enhancement of 25 years for the finding of personal discharge of a firearm resulting in death, as well as 5 years to be served concurrently for the charge of aggravated discharge of a firearm.

¶ 25                        B. Subsequent Procedural History

¶ 26    We affirmed Mr. Class's convictions on direct appeal (*People v. Class*, 363 Ill. App. 3d 1193 (2006) (table) (unpublished order under Supreme Court Rule 23)), rejecting his arguments that the trial court had improperly granted the State's petition to extend the trial term, improperly excluded Milton Correa's testimony about Mr. Salazar having admitted to shooting Tony Koniewicz, and improperly concluded that the State had proved his guilt beyond a reasonable doubt.

¶ 27    Mr. Class filed his first petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2006)), on August 18, 2006. In that petition, filed *pro se*, Mr. Class alleged his trial counsel was ineffective for failing to investigate, interview, and present alibi witnesses. To substantiate this allegation, he attached six affidavits from family members, all averring that he was home from 7:30 p.m. onwards on the night of the shooting. In addition to these family member alibi witnesses, Mr. Class also alleged the existence of two additional eyewitnesses, but did not identify them or provide affidavits from them.

¶ 28    The court dismissed Mr. Class's initial petition on November 16, 2006. It found that his allegation of ineffective assistance of counsel based on the unnamed eyewitnesses was conclusory and unsupported by any factual allegations. As to the six affidavits from family members, the court found that nothing had prevented Mr. Class from raising arguments related to these witnesses on

9

direct appeal and that he had thus forfeited such arguments. Additionally, the court noted that any failure to call family members as witnesses did not prejudice him, as they were all biased witnesses with a strong incentive to help him.

¶ 29 We affirmed the dismissal of Mr. Class's initial postconviction petition on December 12, 2008. *People v. Class*, 387 Ill. App. 3d 1177 (2008) (table) (unpublished opinion under Supreme Court Rule 23). We noted in that order that the supposed alibi established by the affidavits from his family members was that Mr. Class was at home from 7:30 p.m. onward on the night of the shooting. Ms. Ambrose had testified that she picked up Mr. Class at around 7 p.m. Given this half-hour discrepancy, we concluded that the affidavits did not establish a conclusive alibi, providing an additional reason why the trial attorney's decision not to call the family members did not amount to ineffective assistance.

¶ 30 Mr. Class filed his successive petition—the subject of this appeal—on May 16, 2016, asserting a claim of actual innocence as well as other constitutional claims that he has not pursued in this appeal. In support of his actual innocence claim, he attached to the petition five new affidavits. We will set out those affidavits in the order in which they were reviewed by the trial court in its decision dismissing this successive petition.

¶ 31 The first affidavit the court reviewed was from William Sanchez, dated November 20, 2012. In his affidavit, Mr. Sanchez said that "at 10:00 or 10:30 p.m. on October 22, 2001" he was walking east on Ohio Street and saw a gray Pontiac drive past. He knew this car belonged either to Heather Ambrose or to Eli Salazar, whom he referred to as her spouse. He also noticed a red car stopped on the corner of Ohio Street and Leavitt Street. He witnessed the gray car pull up next to the red one and saw a light-skinned, "almost white" individual fire from the gray car toward the red one. He said in his affidavit that he did not come forward because he was on parole and was

scared that the police might treat him as a suspect in the shooting investigation. He stated that he recently found out that Mr. Class had been convicted of this murder and that he knew that "Angel Class did not have anything to do with the shooting that took place on October 22, 2001."

¶ 32    The second affidavit was from Onyx Santana, dated December 23, 2015. At trial, Mr. Class briefly mentioned Ms. Santana as the person that Eli Salazar was staying with upon returning to Chicago about a month before the murder. In her affidavit, Ms. Santana stated that, in September 2015, she became aware of a statement Mr. Salazar had made to law enforcement shortly after the murder in which he claimed that he, Ms. Ambrose, and Mr. Class had visited Ms. Santana's house on October 22, 2001, the day of the murder. She described Mr. Salazar's statement as false. According to her, Mr. Class never visited her house that day, but she was visited by Mr. Salazar, Ms. Ambrose, and "an extremely dark black man," who she did not know. At her house, as Ms. Ambrose and Mr. Salazar smoked marijuana, they spoke openly about wanting to shoot someone, which caused her to immediately ask them to leave.

¶ 33    The third affidavit was from Eugene Horton, dated March 1, 2016. Mr. Horton described himself as a trained paralegal who had agreed to help Mr. Class find witnesses to the shooting. His assistance came in the form of posting notices on streetlamps in the community where the shooting occurred. In the affidavit, he stated that he agreed to help Mr. Class because he believed he was innocent.

¶ 34    The fourth affidavit was from Robert Pasco, dated March 13, 2016. Mr. Pasco said that, on October 23, 2001, Mr. Salazar told him that he "finally got C-note Tuggie" last night. Mr. Pasco explained that "C-note Tuggie" was a nickname for Tony Koniewicz. In his affidavit, Mr. Pasco wrote that Mr. Salazar also told him that he, Ms. Ambrose, and "Black Christopher" were at Onyx Santana's house before they "drove up on Tuggie at a stop sign on Ohio & Levitt and started

11

shooting his car up." Mr. Pasco further stated in his affidavit that Mr. Salazar threatened him, saying that if he told anyone else, he would be killed next. According to Mr. Pasco, on October 24, 2001, he was stopped by the police and asked about the shooting of Tony Koniewicz. He shared with them what Mr. Salazar had confessed to him. He said he had only recently learned that Angel Class had been convicted of the murder and that he did not want an innocent person to be incarcerated for a crime he did not commit.

¶ 35    The last affidavit the court reviewed was from Christopher Stanley, dated December 23, 2015. At trial, Christopher Stanley's name was briefly mentioned by defense counsel as the witness he had asked for a continuance to track down but had ultimately failed to locate despite diligent efforts. In his affidavit attached to this postconviction petition, Mr. Stanley said that, on October 22, 2001, he was "in the back seat of Heather Ambrose['s] car when she pulled up on the side of a red car. Elijah Salazar then lowered the window and started shooting at the red car." According to Mr. Stanley's affidavit, Angel Class was not in the car. Mr. Stanley also alleged that he "did not come forward with this information sooner because he was in fear of his life." He also noted that he first learned that Mr. Class was in jail for this offense in April 2015.

¶ 36    On July 29, 2016, the circuit court advanced the petition to second-stage proceedings, stating that it was doing so based on the affidavit of Christopher Stanley being newly discovered evidence of actual innocence. The court appointed counsel to work on Mr. Class's claim.

¶ 37    On September 29, 2016, Mr. Class, now represented by the Cook County public defender's office, moved for witness statements, grand jury testimony, and leave to subpoena police reports in compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). Throughout the last months of 2017, Mr. Class's lawyer told the court she was still looking for witnesses and investigating. In March and April 2018, she was still attempting to locate and interview

Christopher Stanley, whom she referred to as the "principal affiant."

¶ 38    On June 4, 2019, Mr. Class's appointed attorney filed a Rule 651(c) affidavit, stating that she had consulted with Mr. Class and obtained and examined his trial transcripts. She declined to amend his petition and noted her inability to locate Mr. Stanley after diligent efforts. The attorney also supplemented Mr. Class's *pro se* postconviction filing with the six affidavits of family members (which had been attached to his initial petition) that averred that Mr. Class had been home with them from 7:30 p.m. on October 22, 2001.

¶ 39    On June 24, 2019, the State moved to dismiss the petition, arguing that the affidavits from Onyx Santana and Christopher Stanley could not be considered new evidence because both individuals were known to Mr. Class at the time of his trial. Mr. Stanley was in fact named as a potential defense witness in an answer to discovery, and Ms. Santana's name had come up during Mr. Class's direct examination. Additionally, the State argued that Mr. Class's new affiants provided inadmissible hearsay, the substance of their statements pertained to collateral matters, and, at most, their statements raised reasonable doubt, not proof of actual innocence. Additional briefing pertaining to whether Mr. Stanley was available to testify at trial was submitted by appointed counsel for Mr. Class and by the State.

¶ 40    The appellate record before us is not well organized, and many things appear to be out of order. It also appears that some of the pleadings in this case are missing. However, according to the trial court's order dismissing this successive postconviction petition, on January 2, 2020, counsel for Mr. Class filed a motion to supplement the successive petition with an investigative report of an interview of Christopher Stanley that took place on November 8, 2019. According to the trial court order, in that interview, which was conducted by an investigator for the Cook County public defender's office, Mr. Stanley acknowledged that he had signed the affidavit. However, he

also stated that "neither he nor Angel Class were there during the incident." The court order also states that in response to the investigative report regarding Mr. Stanley, the State filed a supplemental motion to dismiss on January 15, 2020, arguing that the Stanley affidavit could no longer be presumed to be true where he rebutted his own claims with his subsequent statements. Mr. Class responded through counsel that due to the inconsistencies in the statements from Mr. Stanley, he should at least be allowed to testify at a third-stage hearing, so the court could assess his credibility.

¶ 41 On July 14, 2020, the trial court granted the State's motion to dismiss the petition. The trial court concluded that Mr. Class's "filings and supporting documentation fail under the cause and prejudice standard of review and fail to demonstrate actual innocence." The trial court retraced the trial evidence and procedural history. It then examined each of the five new affidavits separately under what appears to be a combination of the criteria for finding cause and prejudice and the criteria for finding a sufficient showing of actual innocence.

¶ 42 The court began with Mr. Sanchez's affidavit. The court found "cause" for not producing this witness earlier, since Mr. Sanchez was not known to have been a witness. However, the court found no prejudice because the affidavit failed to explain how Sanchez knew Ms. Ambrose, Mr. Salazar, or Mr. Class or what they looked like. The court found "nothing of a conclusive character that would probably change the result on retrial."

¶ 43 The court next addressed Onyx Santana's affidavit. The court found no cause for failure to present Ms. Santana earlier and concluded that even if there were cause, her affidavit failed to demonstrate actual innocence, since she did not aver that she was present at the time of the shooting.

¶ 44 The court found Mr. Horton's affidavit inadmissible, as it was not notarized and contained

14

no personal knowledge about the case.

¶ 45    In reference to Robert Pasco's affidavit, the court found cause but no prejudice. The court noted that Mr. Class "seeks through Pasco to admit the same type of hearsay statements allegedly made by Elijah Salazar to Milton Correa, that the trial court did not allow, and which decision has been affirmed." The court concluded that "Pasco's affidavit fails to offer any admissible testimony."

¶ 46    Finally, in reference to Mr. Stanley's affidavit, the court concluded that he was not "newly discovered" as he "could have been produced earlier with due diligence." The court noted that "[t]he record is devoid of any efforts to find him and bring him to court except the phrase diligent efforts." The court concluded that the affidavit failed to demonstrate actual innocence because it did not say how long Mr. Stanley had known Mr. Class or how they were acquainted. The court also emphasized Mr. Stanley's subsequent statement to the public defender's investigator that neither he nor Mr. Class were present for the shooting. In the court's view, this statement contradicted his sworn affidavit and supported a finding that the affidavit "does not provide total vindication or exoneration of petitioner and does not warrant an evidentiary hearing."

¶ 47    After highlighting the infirmities of each of the affidavits, the circuit court dismissed Mr. Class's successive postconviction petition. This appeal followed.

¶ 48                                    II. JURISDICTION

¶ 49    The circuit court dismissed Mr. Class's postconviction petition on July 14, 2020, and Mr. Class timely filed his notice of appeal on July 15, 2020. We have jurisdiction over this appeal, pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 606 (eff. Jan. 1, 2023) and Rule 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 50                                  III. ANALYSIS

¶ 51    The Act provides a three-stage process for persons serving criminal sentences to "assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). Generally, the Act contemplates the filing of only one postconviction petition, and section 122-3 of the Act provides that any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived. *People v. Orange*, 195 Ill. 2d 437, 449 (2001); 725 ILCS 5/122-3 (West 2014). However, the procedural bar against successive proceedings will be relaxed on either of two grounds: (1) "where the petitioner can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding" or (2) "where the petitioner asserts a fundamental miscarriage of justice based on actual innocence." *People v. Robinson*, 2020 IL 123849, ¶ 42. Where, as here, a request for leave to file a successive petition is granted, the petition is docketed for second-stage proceedings. *Id.* ¶ 43.

¶ 52    The second stage of postconviction review tests the legal sufficiency of the petition. *People v. Domagala*, 2013 IL 113688, ¶ 35. At this stage, "all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). The State is permitted to file responsive pleadings, and the circuit court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 245-46 (2001). Such a showing exists when the petitioner's well-pleaded allegations of a constitutional violation would entitle them to relief *if proven* at a subsequent evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 35. "Where, as here, the circuit court dismisses a defendant's postconviction petition at the second stage after finding no substantial showing of a constitutional deprivation has been made, review of the

dismissal is *de novo.*" *People v. Dupree*, 2018 IL 122307, ¶ 29.

¶ 53 For the reasons that follow, we agree with Mr. Class that he has made a substantial showing of actual innocence, and we therefore remand this case for a third-stage evidentiary hearing. This holding makes it unnecessary for us to consider Mr. Class's alternative claim that he received unreasonable assistance from postconviction counsel.

¶ 54 To establish an actual innocence claim, the supporting evidence must be (1) newly discovered, (2) material and not merely cumulative, and (3) "of such conclusive character that it would probably change the result on retrial." *People v. Edwards*, 2012 IL 111711, ¶ 32. Newly discovered means "the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is material if it is "relevant and probative of the petitioner's innocence"; it is noncumulative if it "adds to what the jury heard." *Id.* Evidence is conclusive if it "would probably lead to a different result" when considered along with the trial evidence. *Id.*

¶ 55 As our supreme court explained in *Robinson*, 2020 IL 123849, ¶ 48, "[u]ltimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." To meet this standard, the new evidence "need not be entirely dispositive" (*id.*); it "need only be *conclusive* enough to *probably* change the result upon retrial" (emphases in original) (*People v. Davis*, 2012 IL App (4th) 110305, ¶ 62). In other words, "[p]robability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Robinson*, 2020 IL 123849, ¶ 48. As we are dealing with probabilities, the task of the court is essentially to make a prediction about "what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL

17

113307, ¶ 97.

¶ 56    Making such a prediction requires what our supreme court has referred to as a "comprehensive approach." *Id.* The purpose of this holistic analysis is not to "redecide the defendant's guilt," but to determine whether all the facts and surrounding circumstances should be " 'scrutinized more closely.' " *Id.* (quoting *People v. Molstad*, 101 Ill. 2d 128, 136 (1984)). This entails looking at all of the new evidence cumulatively and then weighing it against the strength of the evidence at trial. See, *e.g.*, *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 150 (concluding that "[a]ffidavits from over half a dozen witnesses who contradict[ed] elements of [the State's witness's] account [were] sufficiently conclusive to alter the result on retrial, particularly given the weakness of the State's case at trial"); *People v. Serrano*, 2016 IL App (1st) 133493, ¶¶ 37-41 (petitioner's new evidence, which demonstrated some "consistency on key details" weighed against "flimsy" trial evidence.").

¶ 57    The fundamental problem with the trial court's analysis in its order granting the State's motion to dismiss Mr. Class's petition is that, rather than employing the comprehensive review described above—an analysis that considers *all* of the evidence, "both new and old together"—it employed a piecemeal approach, assessing each of the affidavits individually and finding that none of them, standing alone, was sufficient to make the necessary showing of actual innocence.

¶ 58    We also note that the trial court entered its order on July 14, 2020, less than a month after our supreme court issued its decision in *Robinson*, 2020 IL 123849, ¶¶ 55-56, where it endorsed the standard elaborated above (*supra*, ¶ 55) and explicitly disavowed the more demanding "total vindication or exoneration" standard some circuit and appellate courts had relied on when weighing the sufficiency of evidence in support of claims of actual innocence. *Robinson* changed the calculus of what is required to advance a colorable claim of actual innocence and that change

is not reflected in the trial court's reasoning.

¶ 59    In support of this piecemeal approach the trial court cited *People v. Jones*, 211 Ill. 2d 140, 149, *as modified on denial of reh'g* (May 24, 2004) for the proposition that the cause and prejudice test must be applied to individual claims, not to the petition as a whole. *Jones* is simply not instructive here. As our supreme court has made clear, where a petitioner "sets forth a claim of actual innocence in a successive postconviction petition, the defendant is excused from showing cause and prejudice." *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009). Thus, Mr. Class did not need to show cause and prejudice on his actual innocence claim.

¶ 60    More importantly, while each claim in a successive petition must be analyzed separately, and the petitioner must make a showing of cause and prejudice on every non-innocence claim they advance, actual innocence is but *one* claim and it is a claim that our supreme court has made clear requires a comprehensive approach. *Coleman*, 2013 IL 113307, ¶ 97. Thus, there was no basis for the trial court to analyze each of the affidavits in isolation and dismiss the petition based on its view that none of the affidavits, standing alone, could make a substantial showing of actual innocence.

¶ 61    We recognize that on appeal Mr. Class also appears to have taken a piecemeal approach, focusing his argument primarily on the affidavit of William Sanchez, while neglecting to discuss in significant detail the other affidavits he attached to his successive petition, or the ways in which those affidavits corroborate each other and some of the trial testimony. To the extent that the State might suggest forfeiture in this approach, we reject such an argument.

¶ 62    Parties must preserve issues or claims for appeal, not arguments. *Brunton v. Kruger*, 2015 IL 117663, ¶ 76. Mr. Class has consistently presented his *claim* of actual innocence and consistently contended that he has made a sufficient showing to warrant a third-stage hearing.

While the specific arguments he has marshalled in support of his claim have relied on different affidavits at different procedural junctures, the claim itself has remained constant.

¶ 63 Furthermore, forfeiture and waiver are limitations on the parties, not on the court, and we have long recognized that "we may address an otherwise waived [forfeited] issue to ensure a just result." *People v. Mosley*, 2023 IL App (1st) 200309, ¶ 30. Thus, we need not limit our analysis to the Sanchez affidavit, and, in assessing Mr. Class's claim, we will address the evidence presented by his petition in the comprehensive manner that the law requires.

¶ 64 Upon reviewing all of the evidence, "new and old together," we are struck by the fact that Heather Ambrose was the *sole* witness that tied Mr. Class to this murder. There was no physical evidence inculpating Mr. Class, and while several other witnesses testified as to a general sequence of events the night of the murder, none identified Mr. Class as the shooter or placed him anywhere near the scene of the crime at the approximate time of the shooting. Mr. Class came onto the radar of law enforcement as a potential suspect only after they had spoken with Ms. Ambrose and Mr. Salazar. Furthermore, unlike Ms. Ambrose or Mr. Salazar, who had left Chicago by the time police tracked them down as persons of interest in the homicide investigation, there is no indication that Mr. Class ever went into hiding after the shooting or attempted to flee to another jurisdiction. The most that can be said is that the officers testified that Mr. Class tried to leave through a back door, when the officers came to arrest him at his daughter's birthday party—a charge that Mr. Class denied at trial.

¶ 65 It appears undisputed that Mr. Class never made any out-of-court statements acknowledging involvement in this shooting to the police, and there is no evidence in this record that he made any such statement to anyone else. He has maintained his innocence from the outset, testifying that he was not present at the shooting. He also provided a plausible explanation as to

why Heather Ambrose might have named him as the shooter, considering their confrontation the day before the shooting.

¶ 66    As for his new evidence, Mr. Class attached to his successive petition five affidavits (from William Sanchez, Onyx Santana, Eugene Horton, Robert Pasco, and Christopher Stanley). He also supplemented his petition to include the affidavits from alibi witnesses that he had attached to his initial petition. We note at the outset that some of this evidence was correctly discounted by the trial court because it was not newly discovered.

¶ 67    The affidavit from Onyx Santana, for example, while certainly material to the question of Mr. Class's innocence, does not meet the criteria for newly discovered evidence because Mr. Class could have discovered her before trial with the exercise of due diligence. The record shows that she was known to him at trial—her name came up during his direct examination and she was mentioned in a discoverable, handwritten statement from Eli Salazar that the State possessed. Mr. Class provides no explanation for why he failed to call her to testify on his behalf at trial. The affidavits from his alibi witnesses—which the court did not mention in its order dismissing his successive petition—fail for the same reason. Mr. Class was obviously aware of these witnesses at trial (they are his family members), but his trial attorney made the decision not to call them to testify on his behalf. He cannot now say that they are newly discovered.

¶ 68    The court was also correct in its assessment of the Eugene Horton affidavit. While Mr. Horton's affidavit may have met the criteria for newly discovered, it lacks any probative value on the question of Mr. Class's innocence, and thus does not support Mr. Class's claim.

¶ 69    However, the remaining affidavits (from Mr. Stanley, Mr. Pasco, and Mr. Sanchez) are all newly discovered, material, and, taken as true, support Mr. Class's claim of innocence. When read together and weighed against the unusually scant trial evidence, these affidavits raise serious

questions about Mr. Class's guilt that undermine this court's confidence in his conviction.

¶ 70    Two of these affidavits are from witnesses who saw Tony Koniewicz get shot and affirmatively say that Mr. Class was not the shooter. One of those witnesses, Mr. Stanley, claimed to have been with the shooters when they shot Mr. Koniewicz, although he backpedaled in a subsequent statement and told the public defender's investigator that neither he, nor Mr. Class, were in the car. Mr. Sanchez said, in his affidavit, that the person who shot at the red car and killed Mr. Koniewicz was light-skinned and "almost white." He also says that he knows that Mr. Class did not have anything to do with the shooting.

¶ 71    The third of these new witnesses to provide an affidavit was Mr. Pasco, who averred that, on the day after the murder, Eli Salazar admitted to him that he was the one who killed Mr. Koniewicz and boasted to him that he "finally got C-note Tuggie last night." We are aware that at his original trial, Mr. Class's attorney attempted to put on another witness—Milton Correa—who would have testified to a very similar admission by Mr. Salazar soon after the shooting.

¶ 72    Certain details from the Stanley and Pasco affidavits are internally consistent with and lend support to each other. For example, Mr. Pasco claimed in his affidavit that when Mr. Salazar admitted to him the day after the murder that he was the shooter, he also mentioned that he had been at Onyx Santana's house before the shooting, with Ms. Ambrose and "Black Christopher." Mr. Stanley, in his own affidavit, does not mention Onyx Santana, but he does admit to being in the car with Ms. Ambrose and Mr. Salazar during the shooting. Reading these two statements together, it is not unreasonable to presume that "Black Christopher" is a nickname for Christopher Stanley. Further, both of these affidavits support an inference that there were three individuals in the car who fired upon Mr. Koniewicz and that Mr. Class was not one of them.

¶ 73    Rather than analyze all this evidence in the holistic manner that the law requires, the trial

court assessed these affidavits in isolation, combing each one for evidentiary infirmities and potential credibility issues and minimizing any probative value it might contain. For example, the court dismissed Mr. Pasco's statement as "the same kind of hearsay statement" that the court had refused to admit at trial (alluding to the Correa testimony). But even if Mr. Pasco's affidavit contained hearsay, the court nonetheless had an obligation to consider the substance of the statement in evaluating Mr. Class's claim. At the second stage, the court cannot disregard evidence merely because it is hearsay. See *People v. Velasco*, 2018 IL App (1st) 161683, ¶¶ 117-19 (explaining that unlike a third-stage evidentiary hearing, where a defendant no longer enjoys the presumption that the allegations in their petition and accompanying affidavit are true, at the second-stage, hearsay evidence is admissible and "must be taken as true"); see also *People v. Shaw*, 2019 IL App (1st) 152994, ¶¶ 64-67 (noting that while historically, there was a general rule that "hearsay is insufficient to support a petition under the Act," that rule was undermined by a 2013 amendment to Illinois Rule of Evidence 1101(b)(3) (eff. Apr. 8, 2013) (where our supreme court added "postconviction hearings" to the list of "[m]iscellaneous [p]roceedings" to which the rules of evidence "do not apply" (emphasis omitted))).

¶ 74    Relatedly, the court completely disregarded the testimony of Christopher Stanley on the basis of what amounted to a credibility determination. In the court's view, Mr. Stanley's subsequent statement to a Public Defender's investigator, although Mr. Stanley acknowledged that he had signed the affidavit, "was a direct contradiction of his sworn affidavit" where he had stated that "he was present, saw the shooting, and that Elijah Salazar was the shooter." At this stage of the postconviction process, however, prior to a third-stage evidentiary hearing, the court does not consider credibility. See *Domagala*, 2013 IL 113688, ¶¶ 34-35 (explaining that the third stage, not the second stage, is when the court must "determine witness credibility, decide the weight to be

23

given testimony and evidence, and resolve any evidentiary conflicts.").

¶ 75    The court also rejected Mr. Stanley's testimony on the separate basis that, in its view, it was not technically newly discovered evidence because he was known to Mr. Class at trial and could have been produced with due diligence. The court noted that "[t]he record is devoid of any efforts to find him and bring him to court except the phrase 'diligent efforts.' " We do not think, however, that the record supports this determination. In advancing an actual innocence claim, it is the *evidence* in support of the claim that must be "newly discovered," not necessarily the source. *People v. Fields*, 2020 IL App (1st) 151735, ¶ 48. Thus, "an affidavit from a witness may be newly discovered, even when the defense knew of the witness prior to trial." *Id.* (citing *People v. White*, 2014 IL App (1st) 130007, ¶ 20). Further, "[n]ewly discovered evidence" includes testimony from a witness who essentially made himself unavailable as a witness out of fear of retaliation. *Ayala*, 2022 IL App (1st) 192484, ¶ 137 (citing *Ortiz*, 235 Ill. 2d at 334).

¶ 76    Here, in contrast to Onyx Santana, where the record is seemingly devoid of any efforts to have her testify at Mr. Class's trial, the record contains several references to Mr. Class's trial counsel trying, but ultimately failing, to produce Mr. Stanley at trial. Trial counsel asked for several continuances, repeatedly delaying the start of his case-in-chief and claiming his investigators needed more time to locate a witness. This witness later turned out to be Mr. Stanley, who trial counsel referred to as a "crucial witness" without whom he did not want to continue presenting his case. At one appearance, counsel stated that Mr. Stanley had "decided to disappear on us." For his part, Mr. Stanley stated in his affidavit that he did not come forward sooner because he was scared for his life, a statement which, taken as true, explains his evasiveness leading up to Mr. Class's trial and suggests that he effectively "made himself unavailable." In our view, there is enough in the record to support Mr. Class's claim that Mr. Stanley could not be produced to testify

at trial, despite defense counsel's diligent efforts. We therefore find that Mr. Stanley's affidavit meets the criteria for newly discovered evidence.

¶ 77    As for the Sanchez affidavit, the court disregarded it on the basis that it "did not state that the shooter, who he described as light-skinned, was not a person who fit petitioner's description." However, Mr. Sanchez's affidavit does clearly state that he observed the shooting and that he knew "that Angel Class did not have anything to do with the shooting that took place on October 22, 2001."

¶ 78    Mr. Sanchez does not explain how he came to know Angel Class or why he remembers this incident so many years after the fact. It is also confusing that he never expressly says that the shooter was not Angel Class or that Angel Class is not "light-skinned" or "almost white."

¶ 79    The Sanchez affidavit also presents a time for this shooting that may be at odds with some of the trial testimony, but that testimony offers a broad spectrum of times that this shooting could have occurred. No witness at trial provided an exact time for the shooting. Heather Ambrose testified that Mr. Class and Mr. Salazar knocked on her door after 7:00 p.m. and that they then drove around the neighborhood in her car for some unspecified amount of time before the shooting occurred; Tammy Scatanese testified that she got a call from the hospital about her brother just after 9:00 p.m.; Gerard Recasi, who was in the vehicle that was shot at, testified that the shooting occurred during "evening hours" and that he got to the hospital approximately six minutes after the shooting; Officer Arroyo testified that at "about 10:00 o'clock" he received an assignment to go to St. Mary's hospital; Robert Davie, the forensic investigator, was assigned to go to the crime scene to begin the homicide investigation at "about 11:00 o'clock"; and Detective Rodriguez, the lead detective on the case, received an assignment to investigate "a man shot at Ohio and Leavitt" at approximately 10:40 p.m. Thus, the trial evidence never pinned down a precise time for the

shooting and the 10:00 to 10:30 time frame averred to by Mr. Sanchez is in keeping with some, but not all, of the trial testimony.

¶ 80    Although there are issues with the Sanchez affidavit, and Mr. Sanchez ultimately fails to connect all of the dots in his testimony, this affidavit from another person who purports to be an eyewitness, adds to the testimony of the other two affidavits that the court should have considered.

¶ 81    The evidentiary and credibility issues highlighted by the trial court are significant and need to be adjudicated, but that is precisely what a third-stage evidentiary hearing is for. At the second stage, where the court must accept as true all well-pleaded allegations not positively rebutted by the record, the existence of such issues is not enough to justify dismissal, particularly where, as here, the cumulative weight of the evidence presented by Mr. Class "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56.

¶ 82    While Mr. Class has not conclusively established his innocence, he has made a substantial showing that his case merits further scrutiny, which is what is demanded of him at this stage. We therefore reverse the circuit court's judgment dismissing Mr. Class's postconviction claim of actual innocence and remand for a third-stage evidentiary hearing on that claim.

¶ 83    Finally, Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) permits a reviewing court, in its discretion, to order that a case be assigned to a different judge on remand. See *Serrano*, 2016 IL App (1st) 133493, ¶ 45; *People v. Tally*, 2014 IL App (5th) 120349, ¶ 43. Pursuant to the discretion conferred upon us by this rule, we find that the interests of justice would be furthered by assigning this case to a different judge on remand.

¶ 84                                IV. CONCLUSION

¶ 85    For the foregoing reasons, we reverse the dismissal of Mr. Class's petition, remand for a

26

third-stage evidentiary hearing, and direct the presiding judge of the criminal division of the circuit court to assign this case to a new judge for further proceedings.

¶ 86    Reversed and remanded.

*People v. Class*, 2023 IL App (1st) 200903

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 02-CR-13513; the Hon. Angela Munari Petrone, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Michael H. Orenstein (Kara Kurland, law student), of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, John E. Nowak, and Andrew D. Yassan, Assistant State's Attorneys, of counsel), for the People. |