2024 IL App (1st) 231913-U

No. 1-23-1913

Order filed November 4, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 12327 |
| | ) | |
| ASHUR HIDOU, | ) | Honorable |
| | ) | Anjana M.J. Hansen, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court properly dismissed defendant's successive postconviction petition, where defendant failed to make a substantial showing of actual innocence based on newly discovered evidence.

¶ 2    Defendant Ashur Hidou appeals the second-stage dismissal of his successive postconviction petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, he argues the circuit court erred where he made a substantial showing that he was actually innocent based on newly discovered evidence, namely, the affidavit

of Kalvin Clark, whose testimony would have supported defendant's affirmative defense at trial that he killed the victim in self-defense. We affirm.

¶ 3    Defendant was charged by indictment with two counts of first degree murder, based on the fatal stabbing of Israel Moreno (also known as Kiki) in Des Plaines on June 14, 2008. Following a bench trial, defendant was found guilty of first degree murder and sentenced to 35 years in prison. We affirmed on direct appeal. *People v. Hidou*, 2013 IL App (1st) 103511-U.

¶ 4    Our order on direct appeal detailed the evidence presented at trial. Here, we summarize the facts to the extent necessary to understand defendant's actual innocence claim.

¶ 5    At trial, Vanessa Claudio testified that she had a prior dating relationship with both defendant and Kiki. Vanessa dated defendant for two weeks around 2004, and defendant maintained a close relationship with her family. Defendant told her that he belonged to the Latin Kings gang. Vanessa dated Kiki, who lived about two blocks from her, for 14 months, and she broke up with him 4 months before the incident.

¶ 6    On the night of June 13, 2008, Vanessa was with friends, family, and defendant at her home in Des Plaines.[1] Around 5 p.m., defendant showed her a knife that he purchased. After 1:30 a.m., she heard Kiki calling her name outside, but she did not respond. After Kiki stopped calling her name, she looked out the window and saw him with his friend, Greg Latson, walking toward Kiki's house. Defendant left shortly thereafter saying his sister was outside to pick him up. On defendant's way out of the house, she heard him say he would "get" the "guys that are messing" with her brother. Vanessa heard yelling outside. She went outside and saw Kiki lying in the street

---

[1] Multiple members of Vanessa Claudio's family testified at trial and share the same last name. We therefore refer to those witnesses by their first names.

at the intersection of Laurel Avenue and Washington Street with defendant and Latson present. Kiki was pale, and his "guts and stuff" were coming out of his side. Defendant was "really bloody," and his eyes were swollen.

¶ 7 Latson testified that at about 2 a.m. that night, he and Kiki walked to Vanessa's house, where Kiki called out her name. When she did not respond, they left to walk to Kiki's house. As they were walking, Latson heard Kiki say, "What's up b***?" Latson turned and saw defendant "standing face-to-face" with Kiki. Defendant drew a large knife and stabbed Kiki in his left side as Kiki "swung" at defendant with his left arm. They fell backwards, and Kiki landed on top of defendant. Defendant continued stabbing Kiki as they fell, and stabbed him "[a] lot." Latson ran toward them and grabbed defendant's arm to try to take the knife. As Latson kneed defendant in the face, defendant shouted, "King Love," grabbed the blade of the knife, and cut his hand. Latson denied that Kiki had any weapons at that time, or that Latson struck defendant at any time other than kneeing him in the face.

¶ 8 Reynaldo Maldonado testified that he was at Vanessa's home that night when defendant left the house. He looked out the window and saw defendant walking in the same direction as Kiki. Maldonaldo went outside and saw Latson on top of defendant struggling over a knife. Kiki walked away toward his house and collapsed with his "insides hanging out" of his stomach area. Maldonado later saw defendant at Vanessa's house with "blood all over" and his hands were wrapped and bleeding.

¶ 9 The medical examiner who performed Kiki's autopsy testified that Kiki had three stab wounds on the left front chest and abdomen and five stab wounds on his back, and his heart and

lung were wounded. The examiner opined that Kiki died as a result of multiple stab wounds, and the manner of death was homicide.

¶ 10    Defendant testified about an incident at the Claudio home where Kiki asked him to join the Latin Counts street gang, and defendant declined. He denied that he was a member of a gang or that he told Vanessa and her brother that he was a member of the "Kings."

¶ 11    On June 14, 2008, defendant was at the Claudio family's apartment and had displayed his knife, which he started carrying because he had been jumped by people whom he believed were Kiki and the Latin Counts. Defendant left the apartment when he heard a horn outside, which he thought was his sister arriving to pick him up.

¶ 12    Outside, Kiki and another man, whom defendant later learned was Latson, "speed walk[ed]" toward defendant, with Kiki moving behind him and Latson moving in front of him. Defendant thought they would kill him. He turned around, was hit by Kiki, grabbed from behind, and slammed to the ground. Defendant was continuously hit in the face, dragged, and kicked. He "blacked out for a second" and could not see. Defendant drew his knife because he "wanted them to get off [him]," and started swinging it "wildly." He blacked out again and when he regained consciousness, he was on his side and the knife blade was coming toward his chest. He grabbed the blade, struggled for it, and next remembered hearing Vanessa's father tell him it was "okay" and he "had to let go of the blade." His nose was broken and bleeding, and he was also bleeding from his hand, head, elbows, and knees. He denied yelling "King Love" during the struggle and confirmed that the phrase signals a love for the Latin Kings. Defendant admitted that he never saw any weapons in Kiki's hand and did not inform the police that he acted in self-defense.

¶ 13    Angelo Claudio, Vanessa's father, testified for the defense that defendant and Kiki were both "like one of [his] kids." He indicated that Kiki had been tormenting the family. On the night of the incident, Vanessa screamed there was a fight outside. Angelo ran outside and saw someone called "Magic" holding defendant down and screaming "he had a knife." Kiki was on top of defendant "[p]ounding on him." Angelo told Kiki to get off of defendant. Kiki walked toward his house and collapsed. During the altercation, Angelo heard defendant yell, " 'F*** you, Kiki. I hope you die.' " Defendant was "banged up pretty bad" and his eyes were "covered in blood."

¶ 14    The State called in rebuttal assistant state's attorney Catherine Crowley, who testified that on June 14, 2008, she and Detective Mike Keeney interviewed Angelo at the police station regarding the stabbing. Angelo gave a handwritten statement, part of which the State read into the record. Crowley confirmed that Angelo told her he saw Kiki hit defendant in the face and then get up and stagger away before falling. The third man at the scene of the fight shouted, "He's got a knife," and struggled with defendant to get the knife. Angelo never said that the third person was holding defendant down while Kiki punched him.

¶ 15    The trial court found defendant guilty of first degree murder and sentenced him to 35 years in prison. We affirmed on direct appeal and ordered correction of the mittimus to reflect one count of first degree murder, as the original mittimus reflected duplicate murder convictions. *Hidou*, 2013 IL App (1st) 103511-U.

¶ 16    On September 20, 2013, defendant filed through counsel a postconviction petition, alleging several claims of ineffective assistance of trial counsel. The State filed a motion to dismiss, which the circuit court granted. We affirmed. *People v. Hidou*, 2016 IL App (1st) 143903-U.

¶ 17    On September 24, 2020, defendant filed through counsel the instant motion for leave to file a successive postconviction petition and a corresponding successive postconviction petition, alleging that new evidence previously unavailable to him established his actual innocence.

¶ 18    Defendant supported his actual innocence claim with 16 affidavits and several other documents and reports from many sources. Because the issue on appeal only concerns whether defendant made a substantial showing of actual innocence based on Clark's affidavit, we limit our discussion to that affidavit.

¶ 19    In his affidavit, Clark averred that he was currently an inmate at Stateville Correctional Center. On June 14, 2008, at about 2 a.m., a person called "Geo" drove him to the intersection of Laurel and Washington in Des Plaines to sell cannabis to two women. While Clark stood on the sidewalk, a man he now knew as defendant walked toward him talking on his cellphone. As defendant looked down at his phone, two unnamed men, described only as a "black man" and a "Latino man," walked toward defendant.

¶ 20    Clark averred that the "Latino man" approached defendant while "yelling cursing words" at him, and the "black man" approached attempting to get behind defendant. The "Latino man" started punching defendant, and defendant dropped his phone and started "swinging back." The "black man" then punched defendant in the back of the head, causing defendant to fall down. The two men kicked defendant while he was on the ground. Eventually, defendant stood, reached into his "waist area," and drew an "unknown object." Defendant and the "Latino man" swung at each other in "lunging motions" until defendant fell down again with the "Latino man" on top of him. The "Latino man" tried punching defendant again as the "black man" started kicking defendant in the upper shoulder and head area before bending down and grabbing defendant's neck. The "Latino

man" then got off defendant and walked away for a few feet before collapsing. The "black man *** appeared to reach for something," as if he and defendant were "tussling for an object."

¶ 21    Clark averred that he then saw people exit a building nearby and approach defendant and the "black man." The people walked up to the "Latino man" as he lay on the pavement and one of them yelled to call the police. At that point, Clark returned to Geo's vehicle and left the area. Clark averred that he had a clear, unobstructed view of what happened that night near the intersection. He did not know anyone was stabbed, seriously injured, or killed that night, and did not know anyone was arrested and charged with murder for the incident.

¶ 22    Clark further averred that he recently became cellmates with defendant at the Stateville Correctional Center. Eventually they learned that they both spent time in the Des Plaines area. Clark told defendant he stopped going to Des Plaines because of an incident he witnessed in June 2008. After Clark described the incident, defendant stated that incident was the reason he was in prison.

¶ 23    The circuit court advanced defendant's successive postconviction petition to the second stage. The State filed a motion to dismiss the petition, and defendant filed a supplemental successive postconviction petition. A hearing on the State's motion was later conducted.

¶ 24    On November 18, 2022, the circuit court dismissed defendant's successive postconviction petition as to the original successive postconviction petition only, but did not address the claims in the supplement to his petition. The court found in relevant part that, in light of this court's ruling that the trial evidence against defendant was "overwhelming," Clark's affidavit was not so conclusive as to probably change the result at trial. The court also found Clark's affidavit was substantially similar to defendant's trial testimony and thus cumulative.

¶ 25 Defendant filed a notice of appeal, initiating appeal number 1-22-1865. On August 9, 2023, the parties filed an agreed motion for summary disposition, asserting that because the supplemental petition claims were still pending, the November 18, 2022, order was not a final, appealable order. On August 15, 2023, we granted the agreed motion and dismissed the appeal.

¶ 26 On October 10, 2023, the State filed a motion to dismiss defendant's supplemental successive postconviction petition. On October 13, 2023, the circuit court dismissed defendant's supplemental postconviction petition and stated its November 18, 2022, order dismissing the claims in defendant's successive postconviction petition filed on September 24, 2020, was to stand. Defendant timely appealed.

¶ 27 On appeal, defendant argues that the circuit court erred in dismissing his successive postconviction petition at the second stage, where he made a substantial showing of actual innocence based on newly discovered evidence, namely, Clark's affidavit.

¶ 28 The Act provides a three-stage process in which criminal defendants may assert a substantial denial of rights under the Constitution of the United States or of the State of Illinois or both. 725 ILCS 5/122-1(a)(1) (West 2020). The Act generally contemplates the filing of only one postconviction petition, and any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived. *People v. Bailey*, 2017 IL 121450, ¶ 15; 725 ILCS 5/122-3 (West 2020). However, the procedural bar against successive proceedings will be relaxed where the petitioner (1) "can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding," or (2) "asserts a fundamental miscarriage of justice based on actual innocence." *People v. Robinson*, 2020 IL 123849, ¶ 42.

¶ 29    Here, defendant sought to file a successive postconviction petition asserting that he was actually innocent based on newly discovered evidence. He was granted leave to file his successive petition and proceeded to second-stage proceedings under the Act.

¶ 30    During second-stage proceedings under the Act, the State may file a motion to dismiss or an answer to the petition. *People v. Urzua*, 2023 IL 127789, ¶ 34. "At the second stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Roland*, 2023 IL 128366, ¶ 25. "Well-pleaded factual allegations of a postconviction petition and its supporting evidence must be taken as true unless they are positively rebutted by the record of the original trial proceedings." *People v. Sanders*, 2016 IL 118123, ¶ 48. There are no factual issues at the second stage, and credibility determinations are only made at a third-stage evidentiary hearing. *Id.* ¶¶ 31, 42. If the petition makes the requisite substantial showing at the second stage, it is advanced for a third-stage evidentiary hearing. *Urzua*, 2023 IL 127789, ¶ 34. We review *de novo* the second-stage dismissal of a postconviction petition. *Sanders*, 2016 IL 118123, ¶ 31.

¶ 31    When raising an actual innocence claim at the second stage of postconviction proceedings for both initial and successive petitions, a defendant must make a "substantial showing of actual innocence such that an evidentiary hearing is warranted." *Id.*, ¶ 37. To succeed on a claim of actual innocence, the defendant must present "new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is material if it is "relevant and probative of the petitioner's innocence," and noncumulative if it adds to what the trier of fact heard. *Id.* Evidence is conclusive if it, "when considered along with the trial evidence, would probably lead to a different result." *Id.*

¶ 32    The conclusiveness of the new evidence is the most important element of an actual innocence claim. *Sanders*, 2016 IL 118123, ¶ 47. The new evidence need not be completely dispositive or support total vindication or exoneration for it to be likely to alter the result on retrial. *Robinson*, 2020 IL 123849, ¶¶ 55-56. Rather, our inquiry is "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* The purpose of our inquiry is not to "redecide the defendant's guilt," but to determine whether all the facts and surrounding circumstances should be "scrutinized more closely." (Internal quotation marks omitted.) *People v. Class*, 2023 IL App (1st) 200903, ¶ 57. "This entails looking at all of the new evidence cumulatively and then weighing it against the strength of the evidence at trial." *Id.*

¶ 33    When determining the conclusiveness of the newly discovered evidence, the well-pleaded allegations of the motion and supporting documents must be accepted as true unless "it is affirmatively demonstrated by the record that a trier of fact could never accept their veracity," *i.e.*, "where it is affirmatively and incontestably demonstrated to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. Newly discovered evidence is not positively rebutted by the record simply because it is inconsistent with the evidence presented at trial. *Id.*

¶ 34    Defendant asserts that Clark's affidavit constituted newly discovered evidence showing that he was actually innocent, as it establishes that he killed the victim in self-defense. Because self-defense is a justifying or exonerating circumstance, it may serve as the basis of an actual innocence claim. *People v. Woods*, 2020 IL App (1st) 163031, ¶ 41. The elements of self-defense

are: (1) unlawful force threatened against a person; (2) the person threatened was not the aggressor; (3) the danger of harm was imminent; (4) the use of force was necessary; (5) the person threatened actually and subjectively believed a danger existed that required the use of the forced applied; and (6) the beliefs of the person threatened were objectively reasonable. *People v. Lee*, 213 Ill. 2d 218, 225 (2004). If the State negates any one of these elements, the defendant's claim of self-defense must fail. *Id.*

¶ 35 We find that Clark's affidavit does not constitute conclusive evidence. Here, the State's trial evidence showed that defendant was in the Claudio family apartment when Kiki and Latson were outside the apartment. As defendant left the apartment, Vanessa heard defendant state that he would "get" the "guys messing" with her brother. Defendant approached Kiki and Latson armed with a knife. Kiki was unarmed. Defendant struggled with Kiki and stabbed him numerous times in the side and back, to the point where multiple witnesses at the scene stated that Kiki's "guts" were falling out of his wound. One of defendant's witnesses testified that defendant yelled, " 'F*** you, Kiki. I hope you die.' " While Latson and defendant struggled over the knife, defendant yelled "King Love." Defendant left the scene and did not remain to tell police he acted in self-defense. This court previously found the evidence of defendant's guilt "overwhelming." *Hidou*, 2013 IL App (1st) 103511-U, ¶ 70.

¶ 36 Now, defendant presents the affidavit of Clark, defendant's cellmate who purported to be present when defendant stabbed Kiki and offered evidence that closely mirrored defendant's trial testimony. Clark's affidavit, however, is vague and contains few details that would cast doubt on the outcome of defendant's trial.

¶ 37 Clark averred that he witnessed a "Latino man" and a "black man," neither of whom he identified, approach a "young man," whom he now knew was defendant. Clark saw the two men approach defendant from the front and back, much as defendant testified. Clark averred that his view of the incident was clear and unobstructed. However, Clark also averred that he had no knowledge that anyone had been stabbed, seriously injured, or that someone was killed, despite trial witnesses, called by both parties, who testified that defendant and Kiki were covered in blood and Kiki's "guts" were hanging out of his wound.

¶ 38 Clark did not aver that defendant had a knife, or that anyone else was armed, despite it being never disputed that defendant had a knife during the altercation and stabbed Kiki multiple times. Clark's vague observations provide no facts that would show defendant reasonably believed it necessary to stab Kiki numerous times in the back and side in order to protect himself. See *People v. Jones*, 399 Ill. App. 3d 341, 366 (2010) (affidavit with proposed testimony lacking several key details was not sufficiently conclusive); *People v. Davis*, 33 Ill. App. 3d 105, 110 (1975) ("A belief that the decedent, unarmed, might kill or greatly injure the defendant" while the defendant was armed with a firearm, was unreasonable). At best, Clark's affidavit would form the basis for a second degree murder conviction, which cannot support a claim of actual innocence. See 720 ILCS 5/9-2(a)(2) (West 2008); *People v. Horton*, 2021 IL App (1st) 180551, ¶ 46.

¶ 39 In light of the overwhelming evidence that defendant initiated the confrontation with Kiki, who was unarmed, and stabbed Kiki multiple times, we cannot find that Clark's affidavit is conclusive, as it would not have probably resulted in defendant's acquittal at trial. *Coleman*, 2013 IL 113307, ¶ 96. We therefore conclude that the circuit court properly dismissed defendant's

successive postconviction petition, where he failed to make a substantial showing of his actual innocence.

¶ 40    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 41    Affirmed.