2024 IL App (1st) 230533-U

No. 1-23-0533

Order filed June 17, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 1057 |
| | ) | |
| ANDRE MAMON, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's denial of leave to file a successive postconviction petition is reversed, where defendant set forth a colorable claim of actual innocence based on newly discovered evidence that another person shot the victim and defendant was not involved in the shooting.

¶ 2    Defendant Andre Mamon appeals the denial of his motion for leave to file a successive postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). On appeal, he asserts that he set forth a meritorious claim of actual innocence,

based on an affidavit from a newly discovered eyewitness who averred that another person shot the victim, and defendant was not present when it occurred. We reverse and remand to the circuit court for second-stage postconviction proceedings.

¶ 3    Defendant was charged by indictment with six counts of first degree murder and two counts of unlawful use of a weapon by a felon (UUWF), arising from the shooting of Leon Henry on December 5, 2007.[1] The State proceeded to trial on the first degree murder counts, and nol-prossed the UUWF counts. Following a 2009 jury trial, defendant was found guilty of first degree murder and sentenced to 52 years in prison.

¶ 4    We summarize the relevant evidence adduced at trial.

¶ 5    Martese Harris testified that on December 5, 2007, just before 4 a.m., he was driving east on 79th Street near Crandon Avenue. He saw people arguing at a gas station and drove around the block. When he passed the gas station again, he saw two women and a man, whom other witnesses identified as Henry, walking north down the sidewalk on Crandon.

¶ 6    As Harris was driving on Crandon, the vehicle behind him, a black Kia SUV, was "right on" the bumper of his vehicle and flashing its bright lights. Harris pulled over and let the vehicle pass him. The Kia then stopped in the middle of the street. A man wearing a black coat, skullcap, and blue jeans jumped out of the Kia's passenger seat. The man ran around the rear of the Kia toward the three people on the sidewalk and discharged a firearm in their direction. The two women ran north, and Henry ran south toward 79th. The Kia's driver, who was about two inches shorter than the passenger and also wore a black coat and blue jeans, parked the vehicle and hopped

---

[1] Codefendant Lanell Mensah was also charged in the indictment and pleaded guilty prior to defendant's trial.

out. He chased and also shot at Henry. The two shooters chased Henry into a lot on the side of a building behind the gas station on 79th and Crandon, out of Harris's sight. Harris heard three or four gunshots. The driver then returned to the Kia, drove to the passenger and picked him up, and then drove away.

¶ 7     Harris attempted to drive after them and get their vehicle's license plate, but his vehicle got stuck in the snow. He went to the lot where Henry ran, and asked him if he was okay. Henry, who was on his knees and holding himself up by his hands, stated he was not okay. Harris called the police, and the police and an ambulance arrived. Harris never saw the face of the Kia's driver or passenger, and he could not tell how many occupants were in the Kia because it had tinted windows.

¶ 8     Mashica Lowe testified that on December 5, 2007, she was with her sister Dominique Jones, and friends Henry, Enice Lyons, and Anthony Smith. They were "out having a good time smoking and drinking." Henry drove them in his Acura to the gas station parking lot on 79th and Crandon, where a Kia was present. Lowe confirmed she had been drinking, but was not "falling down drunk." Lowe, Jones, and Henry exited the vehicle, and Lowe and Henry danced while music played from the Acura.

¶ 9     As Henry danced and Lowe went to purchase cigars at the gas station, men exited the Kia and started "fighting" and "punching" Henry. One of the men asked Lowe if " '[t]hese are the type of n***s that ya'll f*** with?' " Then, with the exception of Jones, Lowe's group fought with the men who exited the Kia. Lowe recognized three of the men from the Kia as: Lyons's godbrother, Larnell Mensah; defendant, whom Lowe identified in court; and defendant's brother, Myles Swift.

Lowe explained that she had taken Lyons to her godmother's house several times and had seen Mensah and defendant there.

¶ 10    Lowe testified that, when the fight broke up, the men reentered the Kia and attempted to "run all of [them] over" twice. One of the men from the Kia then stole Henry's Acura and drove away with it. The rest of the men drove away in the Kia. Lowe, Jones, and Henry left the gas station and walked northbound on Crandon toward 78th Street. Lowe confirmed that a photograph of the area showed there were streetlights.

¶ 11    While Lowe, Jones, and Henry were on Crandon, the Kia returned and pulled up in front of them with the driver's side facing them. Three men jumped out of the Kia, including defendant, who exited the driver's side holding a black firearm, and an unidentified man, who exited the passenger's side holding a silver firearm. Defendant told Henry, " 'B***, I got you by yourself.' " Henry told Lowe and Jones to run toward 78th Street, and said he would run toward 79th. Jones pulled Lowe away. Lowe looked back as they ran and saw defendant running up to Henry with the firearm and firing at him. Lowe and Jones broke into someone's basement and woke up the people in that house to get help. Lowe returned to Crandon to look for Henry and found him on the ground with bullet wounds. Henry was taken to the hospital, where he later died.

¶ 12    On the date of the shooting, Lowe went to the police station, where she identified defendant from a photo array as having been involved in the fight and shooting. Later that evening, Lowe returned to the police station to view a live lineup. She identified defendant as being involved in the fight and shooting that morning, Swift as being involved in the fight, and Mensah as having exited the Kia at the gas station.

¶ 13    On cross-examination, Lowe testified that she did not mention defendant's name to detectives on December 5, 2007, because she only knew him as "Dre," and knew that he was Lyons's godmother's friend. Lowe also testified that when the shooting occurred, Henry was on Crandon and she heard four gunshots.

¶ 14    On redirect examination, Lowe testified that she told police officers she "knew of" "Andre," the offender, *i.e.*, defendant, by which she meant she knew him by name as she had previously seen him a few times. Lowe confirmed that her statement at the police station said that "Dre" was the shooter.

¶ 15    Jones testified similarly to Lowe regarding the events at the gas station and the shooting. Jones added that in the early morning of December 5, 2007, everyone in Henry's vehicle was drinking, and she had two beer but was not drunk. Henry went up to the Kia and started dancing. Three black men in their early 20s jumped out of the Kia and began fighting with Henry. Lowe, Lyons, and Smith joined the fight, and Jones attempted to break it up. Jones identified defendant as the person who subsequently jumped out of the Kia with a firearm pointed at Henry, but she did not know his name at that time. When Henry said to run, Jones pulled Lowe and ran. As soon as she took a few steps, she "instantly" heard three or four gunshots. Jones identified defendant as the shooter from a photo array and a live lineup.

¶ 16    On cross-examination, Jones testified that she had never seen the shooter before that morning and did not see him at the gas station. At the police station, Jones described one of the individuals who had jumped out of the Kia as a man with dark skin and braids.

¶ 17    The State entered an agreed stipulation that, if called, a forensic pathologist would testify that she examined Henry's body and observed multiple gunshot wounds, including in his back and

right "little finger." The pathologist would opine that Henry died of multiple gunshot wounds, and that the manner of death was homicide.

¶ 18    Defendant called Chicago police officer Garay, who testified that in the early morning of December 5, 2007, he responded to a flash message of the shooting.[2] He approached a residence on the 7800 block of South Crandon and spoke with Jones, who had heard shots and fled the scene. Officer Garay could not recall Jones telling him the names or physical or clothing descriptions of individuals involved in the shooting, or how many individuals were involved or firearms she saw. Officer Garay confirmed that his report did not mention a fight occurring at a gas station before the shooting.

¶ 19    On cross-examination, Officer Garay confirmed that he did not ask Jones to name or describe the people involved in the shooting. He was not the investigator of the shooting and only went as a preliminary investigator to ensure the integrity of the scene and maintain contact with parties, including witnesses.

¶ 20    Defendant entered an agreed stipulation that, if called, Chicago police officer Webb would testify that he interviewed Lowe and Jones on the morning of December 5, 2007, and prepared a report, which did not name or describe any offenders.[3]

¶ 21    In rebuttal, the State called Chicago police officer Thomas Robinson, who testified that on December 5, 2007, at about 4 a.m., he responded to the scene and interviewed Lowe and Jones separately. Lowe identified "Dre" as being involved in the shooting, but she did not know his last name. She described Dre's clothing and identified the area where he lived. When the officer

---

[2] Officer Garay's first name does not appear in the transcript of the trial record.

[3] Officer Webb's first name does not appear in the transcript of the trial record.

showed a photo array to Lowe, she became "very emotional and irate" and identified defendant from the array as "the guy who was shooting at us." Jones also identified defendant from the photo array as the shooter.

¶ 22     On cross-examination, Officer Robinson clarified that Lowe gave him the "general address" of the "two offenders" but not their "specific address." One of the sisters gave a height and weight description of defendant, but Officer Robinson could not recall the description. One of them also told Officer Robinson that she saw defendant at the gas station. Officer Robinson's report named four individuals as being involved in the shooting.

¶ 23     On redirect examination, the officer confirmed that a witness did identify another person as "the shooter," but defendant was the only person identified by name as the shooter.

¶ 24     The jury was instructed on a theory of accountability over defendant's objection. It found defendant guilty of first degree murder. The trial court sentenced defendant to 52 years in prison, which consisted of a 37-year sentence with a 15-year firearm enhancement.

¶ 25     We affirmed on direct appeal, over defendant's contention that the evidence was insufficient where the witnesses' identifications of him as the shooter were unreliable. *People v. Mamon*, 2011 IL App (1st) 101214-U.

¶ 26     On January 16, 2015, defendant filed a *pro se* postconviction petition, alleging he was actually innocent and trial counsel provided ineffective assistance by failing to call his brother, Swift, to the witness stand. Defendant asserted Swift would have testified that defendant was not armed at any time during the incident and did not know that his "associates" were armed, and defendant was not "responsible or accountable for the firing of any weapon at the scene." On April

6, 2015, the circuit court summarily dismissed defendant's petition. We affirmed. *People v. Mamon*, 2017 IL App (1st) 151216-U.

¶ 27 On January 15, 2019, defendant filed the *pro se* motion for leave to file a successive postconviction petition now at issue, attaching a proposed successive petition. He argued in relevant part that he was actually innocent based on newly discovered evidence, specifically, the affidavit of Brian Miller, who was a witness at the scene and saw his cousin James Robinson shoot Henry. Defendant asserted that the affidavit showed he never shot at the victim, did not "solicit, aid, abet, agree, or attempt to aid the person who shot and killed the victim," and "tried to stop the shooter from killing the victim." Defendant asserted that he could not have discovered Miller as a witness through due diligence because he and Miller did not see each other on the date of the shooting, and defendant did not personally know Miller. Defendant also asserted he could not have discovered Robinson as a witness through due diligence because he did not see Robinson on the date of the shooting, and Robinson afterwards went out of town to " 'lay low.' "

¶ 28 Defendant attached the affidavit of Miller, who averred that on December 5, 2007, at about 4 a.m., he was walking on Oglesby Avenue with his cousin Robinson. Mensah drove up to them in a black Acura. Mensah told them that he, Jeremy Wilson, Finley, Swift, and defendant were in a fight with Henry, Lowe, Jones, and "another guy" at the gas station on 79th and Crandon, that Mensah took Henry's vehicle, and "they" should still be at the gas station. Mensah drove off and Miller and Robinson walked toward 79th and Crandon to the gas station. They saw Henry, Lowe, and Jones walking down Crandon toward 78th.

¶ 29 Robinson "all of a sudden took off running" into an alley between Crandon and Oglesby. Miller ran after Robinson because he did not want either of them to be involved in any fight.

Robinson entered a gangway that led to Crandon. Miller was trying to stop Robinson, but Robinson was too far ahead of him. When Miller got on Crandon, he saw Henry run past him toward 79th, with Robinson chasing and shooting at Henry.

¶ 30 When Miller exited the gangway, he did not see defendant, Swift, Wilson, or Finley. He also did not see Lowe and Jones because, when he came out of the gangway, his focus was on Robinson chasing Henry. Miller did not look down 78th because, when he ran behind Robinson and Henry, they were running toward 79th. Miller continued running behind Robinson to stop him from shooting Henry. When Miller caught up to Robinson in a lot, Robinson was "pistol whipping" Henry. Miller did not know Henry was shot because "he was moving around & everything was happening too fast." Miller pulled Robinson off Henry, and they ran to 77th Street and Oglesby, where Wilson's grandmother lived.

¶ 31 Miller averred that he "didn't know [Robinson] had a gun on him before he shot [Henry]." When Miller asked Robinson why he shot at Henry, Robinson replied that Henry had shot at him before. Miller did not go to the police because he was afraid Robinson might also shoot him. After the shooting, Robinson left the state to "lay low," and Miller did not hear from Robinson again.

¶ 32 Miller averred he did not come forward with his information because he had seen defendant "around" the area but did not personally know him, and he did not know that defendant was charged and convicted for Henry's murder. Defendant was close to Robinson, but Miller never hung out with him or talked to him. Around November 2017, Miller was in prison and "bumped into" defendant there. They did not recognize each other initially but eventually learned they were from the same area and talked about both knowing Robinson. Miller mentioned that Robinson was "out of town to lay low for shooting [Henry]." Miller was "shocked" to learn defendant was

convicted for Henry's murder, because he knew defendant had nothing to do with the murder, so he offered to provide an affidavit. Miller concluded his affidavit by stating that defendant was innocent, he did not shoot Henry, and did not have anything to do with Henry getting shot.

¶ 33    Defendant provided his own affidavit, stating that on December 5, 2007, at around 4 a.m., he was in a vehicle with Swift, Wilson, Mensah, and Finley, and they stopped at the gas station on 79th and Crandon. Defendant was in the front passenger seat with his window rolled down. He saw Lowe and asked her if "these the type of n***[s] ya'll f*** with." Henry exited his Acura and began dancing near the Kia. Lowe told Henry "that's the mutha f*** that slapped [her], f*** him up!" Henry told defendant "he will kill [defendant] for slapping his girl." The Kia's occupants all exited and they "all started fighting." Mensah entered Henry's Acura and drove away with it. Defendant and the rest of his group entered the Kia, Finley tried running over Henry and "his people," and they drove away.

¶ 34    Finley drove the Kia "all crazy" and flashed its lights at a vehicle in front of them to get out of the way. Finley passed that vehicle, and they saw Henry, Lowe, and Jones. Henry ran up to the Kia, and Finley stopped the vehicle. Henry told Finley to "get out and fight." Defendant told Finley "we don't have time for this." Defendant exited the vehicle and ran around the rear of the Kia to tell Henry "we ain't trying to fight." At that same time, he heard Finley get out of the Kia. When defendant reached the rear driver's side of the Kia, he heard Henry say "run!" Lowe and Jones ran to someone's house, and Lowe kept looking back at him.

¶ 35    Defendant averred that he heard gunshots and saw two men dressed in all black chasing Henry, but he could not see who they were because they were running with their backs facing him. Finley drove away with defendant in the Kia. Everyone in the Kia asked what happened. Finley

and defendant replied, "we don't know but some n***[s] chased [Henry] and was blowin at him. [Henry] be into it with a lot of n***[s] out there." Finley took defendant home, and defendant was later arrested for the shooting.

¶ 36 Defendant also described in his affidavit his encounter with Miller in prison, in which he learned Robinson "actually killed" Henry. He averred that he was never involved in Henry's murder "in any way," did not shoot him or have a firearm, did not help anyone shoot Henry, and never planned to shoot him. He did not know that Miller and Robinson were the two men dressed in black chasing after Henry and that Robinson was shooting at Henry because he could not see their faces. Defendant still did not know where Robinson was or how to contact him. Further, defendant thought Lowe lied to the police when she identified him as the shooter because she was angry with him for slapping her a few days before the incident. Lowe was looking at him when the gunshots were fired, and he probably was the only person from the Kia that she "knew and hated." Defendant told his trial counsel about Lowe's motive to lie but did not testify because counsel advised him not to. If he had testified, he would have testified to the facts in his affidavit at trial, and would testify to those facts on retrial.

¶ 37 Defendant subsequently filed other *pro se* collateral filings, including a "supplemental claim" to his motion for leave. On November 14, 2022, the circuit court denied defendant's *pro se* filings, including the instant motion for leave to file a successive postconviction petition.

¶ 38 The court found that Miller's affidavit was not newly discovered evidence because defendant could have discovered Miller and Robinson by speaking with Mensah, who essentially invited the "two unknown offenders" to "join in on the action." The court stated that defendant's

and Miller's affidavits indicated defendant "merely waited for Miller's affidavit to fall into his lap," and "[w]aiting for evidence to bump into you is not an exercise of due diligence."

¶ 39    Turning to whether the alleged newly discovered evidence was conclusive, the court found the affidavits had "significant discrepancies." It explained that defendant contended the shooter was facing away from him as Henry ran away from the shooter, but that "implie[d] Henry ran past the shooter after seeing him, as the shooter's back was facing [defendant] and Henry was next to [defendant] when he began running from the shooter." The court found that not only did defendant's affidavit contradict itself on the shooter's location and positioning, but it contradicted Miller's affidavit. The court elaborated that as Miller exited the gangway, he saw Robinson chasing Henry from north to south, which implied Robinson had run north toward Henry and the group, then Henry ran past Robinson heading south past the gangway, and Robinson ran back past the gangway to chase Henry. The court reasoned that Miller's affidavit contradicted defendant's contention that "somehow the shooter's back was always turned." Given this claimed contradiction regarding where Robinson was facing, the court found the affidavits did not "raise the probability of a different outcome at retrial."

¶ 40    The court also stated that defendant's affidavit contradicted his position at trial that he was not present when the shooting occurred. It also contradicted defendant's position in his previous postconviction petition that he was at the scene, but Henry was shot by two unknown offenders from two different directions. The court noted that defendant now asserted that he was on scene and Henry was shot by one unknown shooter from one direction. Moreover, the court noted that defendant's own allegations showed a shared intent with the group he was with, as they beat defendant, stole his vehicle, tried to run Henry over, and confronted him a second time. The court

stated that, "[a]ssuming *arguendo*" Robinson was the shooter who ultimately killed Henry, he "merely obtained the result that [defendant] and his co-offenders sought when they attempted to run [Henry] over with their car as he fled from their beating." Further, Robinson was contacted by Mensah, who fled with the stolen vehicle, and informed about the "ongoing beating" and instructed where the beating was happening. Robinson, who was defendant's " 'good friend,' " ran toward the gas station and on Crandon to cut off Henry's escape. While doing so, Robinson came upon defendant and the occupants of the Kia involved in the second confrontation with Henry, leading to Henry's death that defendant and the occupants of the Kia had just attempted to cause.

¶ 41     The court found the argument that defendant did not share a common design with the original "offenders at the gas station and the additional assailant recruited during their escape" was unconvincing, as defendant "started the whole confrontation" by making a confrontational statement to Lowe. The court also stated that "not once" did defendant "or any of the co-offenders" report this crime to police.

¶ 42     The court stated that, "in contrast to those cases where one is a member of a gang and some other gang member is the ringleader," defendant's "co-offenders were carrying out a beating of Henry after [defendant] started a fight." Additionally, the court found that the co-offenders were "acting on [defendant's] own behalf when they beat Henry, stole his vehicle, and tried to run him over with a car," because Henry "dared to talk back" to defendant after defendant confronted Lowe. The court also found that defendant's "own evidence" bolstered a finding that he was accountable for "Robinson's escalation of the attack to a shooting." Further, it stated that evidence submitted in support of a sentencing claim indicated defendant was a member of a gang at the time of the shooting, which "supports a finding of accountability." The court found that defendant

"actually raised the probability of a finding of accountability from the inconclusive evidence he last presented on postconviction of two unknown and uninvited shooters killing Henry." The court concluded that defendant "submitted evidence that contradicts itself and [his] own attestations, the evidence conflicts with [defendant's] trial strategy and last actual innocence claim, and the evidence evidences [*sic*] [defendant's] accountability for Robinson's actions, this court finds this evidence is not arguably conclusive."

¶ 43    On March 21, 2023, defendant filed a motion for leave to file a late notice appeal, which we allowed.

¶ 44    On appeal, defendant asserts that the circuit court erred in denying him leave to file his successive postconviction petition, as he set forth a meritorious actual innocence claim based on Miller's affidavit, which set forth newly discovered evidence that was material, noncumulative, and would probably change the result on retrial.

¶ 45    The Act provides a three-stage method for persons under criminal sentence to "assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). Generally, the Act contemplates the filing of only one postconviction petition, and section 122-3 of the Act provides that any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived. *People v. Orange*, 195 Ill. 2d 437, 449 (2001); 725 ILCS 5/122-3 (West 2018). However, the procedural bar against successive proceedings will be relaxed on either of the following two grounds where the petitioner: (1) "can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding"; or (2) "asserts

a fundamental miscarriage of justice based on actual innocence." *People v. Robinson*, 2020 IL 123849, ¶ 42.

¶ 46    Here, defendant seeks to file a successive petition asserting that he was actually innocent based on newly discovered evidence. "[A]t the leave-to-file stage, a petitioner seeking to file a successive petition based on actual innocence must make a 'colorable claim of actual innocence.' " *People v. Griffin*, 2024 IL 128587, ¶ 35. To establish a "colorable claim of actual innocence," the supporting evidence must be (1) newly discovered; (2) material and not merely cumulative; and (3) "of such conclusive character that it would probably change the result on retrial." *People v. Jackson*, 2021 IL 124818, ¶ 41. The State concedes that Miller's affidavit was "newly discovered," but disputes whether it was material or conclusive. We therefore must resolve the dispute as to whether the evidence was material or conclusive.

¶ 47    Evidence is material if it is "relevant and probative of the petitioner's innocence," and noncumulative if it "adds to what the jury heard." *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is conclusive if it, "when considered along with the trial evidence, would probably lead to a different result." *Id.* The conclusiveness of the new evidence is the most important element of an actual innocence claim. *People v. Sanders*, 2016 IL 118123, ¶ 47. The new evidence need not be completely dispositive. *Coleman*, 2013 IL 113307, ¶ 97. Rather, the ultimate question is "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilty." *Robinson*, 2020 IL 123849, ¶ 48.

¶ 48    "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* The

purpose of this approach is not to "redecide the defendant's guilt," but to determine whether all the facts and surrounding circumstances should be "scrutinized more closely." (Internal quotation marks omitted.) *People v. Class*, 2023 IL App (1st) 200903, ¶ 57.

¶ 49 When determining the conclusiveness of the newly discovered evidence, the well-pleaded allegations of the motion and supporting documents must be accepted as true unless "it is affirmatively demonstrated by the record that a trier of fact could never accept their veracity," *i.e.*, "where it is affirmatively and incontestably demonstrated to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. "If taking [the] affidavit testimony as true means anything at all, it must mean that a juror, hearing from [the new witness] at a hypothetical retrial, would believe his testimony." (Emphasis and internal quotation marks omitted.) *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 75; see also *People v. McCoy*, 2023 IL App (1st) 220148, ¶ 14. Newly discovered evidence is not positively rebutted by the record simply because it is inconsistent with the evidence presented at trial. *Robinson*, 2020 IL 123849, ¶ 60.

¶ 50 "[T]he standard for alleging a colorable claim of actual innocence falls between the first-stage pleading requirement for an initial petition and the second-stage requirement of a substantial showing." *Id.* ¶ 58. This is a "low threshold." *Id.* ¶ 60. The circuit court is limited to determining "whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial," and the court cannot make credibility determinations. *Griffin*, 2024 IL 128587, ¶ 40. Leave to file a successive petition should be granted "where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Id.* ¶ 45.

¶ 51 We review *de novo* the denial of leave to file a successive postconviction petition alleging actual innocence. *Robinson*, 2020 IL 123849, ¶ 40.

¶ 52 Defendant was found guilty of first degree murder. Under section 9-1(a)(1) of the Code of Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2006)), a person commits first degree murder where the person "kills an individual without lawful justification" and, "in performing the acts which cause the death *** he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." *Id.*

¶ 53 At the outset, it is important to recognize that the State proceeded to trial on a theory of accountability, and the jury received instructions based on accountability. "A person is legally accountable for the conduct of another" when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2006). A defendant possesses the intent to promote or facilitate the crime where (1) "the defendant shared the criminal intent of the principal," or (2) "there was a common criminal design." *People v. Fernandez*, 2014 IL 115527, ¶ 13. Evidence that the defendant "voluntarily attached himself to a group bent on illegal acts" with knowledge of its design supports an inference that he "shared the common purpose" and will sustain his conviction for an offense committed by another. (Internal quotation marks omitted.) *Id.*

¶ 54 In his affidavit, Miller averred that he and Robinson were walking on Oglesby when they received word from codefendant Mensah of a fight involving Henry at a gas station at 79th and Crandon. As Miller and Robinson headed toward that intersection, they saw Henry, Jones, and Lowe walking north on Crandon toward 78th. Robinson ran after them. Miller ran after Robinson

and exited the gangway onto Crandon. While the State's trial evidence showed that defendant chased and shot at Henry southbound down Crandon toward 79th, Miller averred that he saw Robinson doing so. When Miller caught up with Robinson, he saw Robinson "pistol whipping" Henry in a lot and left Henry there. Miller averred that Robinson shot Henry. Miller averred that he did not see defendant at the scene.

¶ 55      We find the evidence in Miller's affidavit was material, as Miller identified someone other than defendant as the shooter and averred that defendant was not involved in the shooting. *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 148 (finding that affidavits identifying someone other than the defendant as the shooter were material and noncumulative, as they were "highly probative" of the defendant's innocence (internal quotation marks omitted)). The affidavit was also noncumulative as there was no evidence at trial showing Robinson was present at or involved in the shooting or the scene. See *id.*

¶ 56      We also find that the evidence in Miller's affidavit was conclusive. As stated, unless rebutted by the record, we must take the statements in Miller's affidavit as true, which means that for purposes of this leave to file stage, a juror would believe Miller's testimony during a hypothetical retrial. *Wilson*, 2022 IL App (1st) 192048, ¶ 75. Miller's affidavit was not positively rebutted by the record just because there was conflicting evidence at trial that defendant was the shooter.[4] See *Robinson*, 2020 IL 123849, ¶ 60 ("[R]ecognizing the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted."). Thus we take the averments in Miller's affidavit as true. If a jury were to believe Miller's testimony, it

_____

[4] We note that, while there was video evidence submitted at trial depicting the altercation at the gas station, there was no video evidence depicting the shooting itself.

would show that Miller exited the gangway on Crandon and witnessed Robinson shooting at Henry while chasing him into a lot, where Robinson was "pistol whipping" Henry. Miller averred that Robinson shot Henry. Our task is not to redecide defendant's guilt, but to determine whether all the facts and surrounding circumstances should be "scrutinized more closely." *Class*, 2023 IL App (1st) 200903, ¶ 57. We find Miller's proposed testimony, if believed, would support defendant's actual innocence claim as it was newly discovered, material, noncumulative, and conclusive.

¶ 57    The State, however, asserts that Miller's affidavit is neither material nor conclusive, as Miller did not see defendant that night and did not know what happened on Crandon before emerging from the gangway onto Crandon and seeing Henry run past the gangway toward 79th with Robinson chasing and shooting at him. The State claims that Miller's version of the events can ultimately be reconciled with and would not refute the State's version of events presented at trial: that defendant and the Kia's driver were armed with firearms and shot at Henry.

¶ 58    However, Miller's affidavit expressly states that he saw Robinson chasing Henry and shooting at him, and that Robinson was "pistol whipping" Henry in a lot while Henry was moving around. He further states that he did not know Robinson had a firearm before he "shot [Henry]," and that he later told defendant that Robinson "went out of town to lay low for shooting [Henry]." As noted, these averments are not rebutted by the record and, therefore, at the leave to file stage, we must take the averments that Robinson shot Henry as true. *Robinson*, 2020 IL 123849, ¶ 60.

¶ 59    Further, notwithstanding the State's contention to the contrary, we cannot at this stage reconcile Miller's version of events with the trial evidence. To believe both version of events, a trier of fact would have to accept that both (1) Robinson and (2) defendant and the other armed occupant of the Kia shot at Henry while chasing him southbound down Crandon toward 79th and

ultimately into a lot. Yet neither Lowe nor Jones testified to seeing anyone besides defendant and one or two other occupants from the Kia chasing Henry. Further, Miller averred that he only saw Robinson chasing Henry down that route.

¶ 60 The State also argues that, according to the facts in Miller's affidavit, defendant would be accountable for Robinson's actions in chasing and shooting at Henry. However, Miller's affidavit set forth allegations that Robinson independently and alone decided to pursue and shoot Henry, and that defendant "didn't have anything to do [with] [Henry] getting shot." While the State's theory that defendant would be accountable for Robinson's actions in shooting Henry is certainly not impossible, our concern here is whether it is probable, versus certain, that the newly discovered evidence would lead a trier of fact to a different result if taken as true. *Robinson*, 2020 IL 123849, ¶ 48. Under that standard, we find that the facts and surrounding circumstances should be "scrutinized more closely." *Class*, 2023 IL App (1st) 200903, ¶ 57.

¶ 61 As the State points out, Miller did not aver that he looked northbound down Crandon, saw defendant or the occupants of the Kia, or saw Jones and Lowe north of the gangway on Crandon. But again, the contentions in Miller's affidavit are not rebutted by the record and we must therefore take them as true. *Robinson*, 2020 IL 123849, ¶ 60. Any specific "shortcomings" in the affidavit "should be addressed at a later stage" where Miller "can be questioned and his credibility assessed." *Griffin*, 2024 IL 128587, ¶ 62. For these reasons, the circuit court erred in denying defendant leave to file his actual innocence claim, and we remand for second stage proceedings.

¶ 62 Finally, defendant requests remand to a different circuit court judge, arguing the judge who denied his motion for leave to file a successive postconviction petition made a number of improper findings, reflecting the court's bias against him. Specifically, defendant asserts that the circuit

court did not accept Miller's affidavit as true, made credibility determinations regarding the allegations in defendant's motion and supporting documents, speculated as to whether defendant's general involvement in a gang would create an inference of guilt by accountability, and misstated the defense theory at trial.

¶ 63    Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) provides that this court may "enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief *** that the case may require." *Id.* Under Rule 366(a)(5), this court may order that a case be reassigned to a new judge on remand. *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002).

¶ 64    However, after a thorough review of the record, we decline defendant's request to remand to a new judge.

¶ 65    For the foregoing reasons, we reverse the judgment of the circuit court and remand to the circuit court for second-stage proceedings.

¶ 66    Reversed and remanded with directions.